# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 7, 2022          Decided June 30, 2023

No. 21-1263

BOARD OF COUNTY COMMISSIONERS OF WELD COUNTY,
COLORADO
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY, ET
AL.,
INTERVENORS FOR RESPONDENT

———

Consolidated with 21-1013

———

On Petitions for Review of an Action of the
United States Environmental Protection Agency

———

*Ethan G. Shenkman* argued the cause for petitioner Board of County Commissioners of Weld County, Colorado. With him on the briefs were *Charles Birkel*, *John R. Jacus*, *Shannon Stevenson*, and *Kathleen Pritchard*. *Bill Davis*, Deputy Solicitor General, Office of the Attorney General of the State of Texas, argued the cause for petitioners State of Texas and Texas Commission on Environmental Quality. With him on

2

the briefs were *Ken Paxton*, Attorney General, *Brent Webster*, First Assistant Attorney General, *Judd E. Stone II*, Solicitor General, and *Michael R. Abrams*, Assistant Solicitor General.

*Alexandra L. St. Romain*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the briefs were *Todd Kim*, Assistant Attorney General, *Laura J. Glickman*, Attorney, U.S. Department of Justice, and *Seth Buchsbaum*, Attorney, U.S. Environmental Protection Agency. *Elliot Higgins*, Attorney, U.S. Department of Justice, also argued the cause for respondent.

*David Baake* and *Ryan Maher* argued the cause for Board of County Commissioners of Boulder County, et al. With them on the brief were *Robert Ukeiley* and *Joshua D. Smith*.

Before: SRINIVASAN, *Chief Judge*, KATSAS, *Circuit Judge*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: This case involves regulation of ozone levels under the Clean Air Act. In August 2018, the Environmental Protection Agency designated northern Weld County, Colorado and El Paso County, Texas as areas that had already attained a 2015 ozone pollution standard. But EPA reversed course after *Clean Wisconsin v. EPA*, 964 F.3d 1145 (D.C. Cir. 2020), remanded these designations. In November 2021, EPA folded northern Weld and El Paso Counties into areas previously designated as not having attained the standard.

Weld County contends that EPA improperly relied on data available in 2018, rather than updated data, and that the data do not support its adverse designation. We hold that EPA

3

reasonably relied on the same data it had used to make the original designation and that the data support the revised one.

Texas argues that El Paso's 2021 nonattainment designation was impermissibly retroactive because EPA made it effective as of the 2018 attainment designation. As a result, a statutory deadline for El Paso to attain the governing standard passed some three months before EPA made the nonattainment designation. And missing the deadline triggered adverse legal consequences. We therefore agree with Texas that El Paso's revised designation, backdated to the date of the original one, was impermissibly retroactive.

I

A

The Clean Air Act establishes a comprehensive scheme to reduce the atmospheric concentration of various air pollutants. The scheme works in three relevant steps.

First, EPA must establish and periodically revise national ambient air quality standards (NAAQS) for pollutants that may endanger public health or welfare. These standards set forth the maximum permissible concentration of the pollutant in the atmosphere. 42 U.S.C. §§ 7408(a)(1)(A), 7409(a)–(b).

Second, EPA must divide the country into geographic areas and designate them according to whether they satisfy the new standard. 42 U.S.C. § 7407(d)(1)(B)(i)–(iii). EPA marks an area as "attainment" when local atmospheric concentration of the pollutant—the area's so-called "design value"—falls below the relevant NAAQS. However, an area must be designated as "nonattainment" if its design value exceeds that

4

level or if the area "contributes" to nonattainment in a "nearby area." *Id.* § 7407(d)(1)(A)(i).

EPA works with the States to make these designations. Within a year of a new NAAQS, each State must make "initial designations" suggesting appropriate areas and attainment designations.    42  U.S.C.  § 7407(d)(1)(A)–(B).    If  EPA proposes to modify an initial designation, it must notify the State in advance and allow it to contest the proposal. *Id.* § 7407(d)(1)(B)(ii).  EPA must finalize its designations within two years of promulgating the new standard—a deadline extendable for at most one year. *Id.* § 7407(d)(1)(B)(i).

Third, States must ensure that their designated areas achieve or maintain attainment status.  To that end, a State must prepare a State Implementation Plan (SIP) specifying how each of its areas will do so.  42 U.S.C. § 7407(a).  EPA sets the SIP deadline,  which  must  be  within  three  years  of  any nonattainment designation. *Id.* § 7502(b).

A nonattainment designation triggers more stringent regulation.  For attainment areas, the SIP need only set forth measures "to prevent significant deterioration of air quality." 42 U.S.C. § 7471.  But for nonattainment areas, the SIP must impose "all reasonably available" measures to achieve attainment "as expeditiously as practicable." *Id.* § 7502(c)(1).

In addition, the Clean Air Act imposes deadlines for nonattainment areas to achieve attainment, which are called "attainment dates."  For ozone standards, EPA must designate nonattainment areas as marginal, moderate, serious, severe, or extreme.  Areas designated as marginal nonattainment have three years to attain, while areas with worse designations have correspondingly longer deadlines.  42 U.S.C. § 7511(a)(1).

5

A worse nonattainment designation triggers more stringent regulation. For moderate nonattainment areas, SIPs must undertake to significantly reduce emissions. 42 U.S.C. § 7511a(b)(1)(A)(i). And for serious, severe, or extreme nonattainment areas, SIPs must undertake even more. *Id.* § 7511a(c)–(e).

Failing to achieve attainment by the attainment date also has consequences. Within six months of that deadline, EPA must determine whether the area achieved attainment. 42 U.S.C. § 7511(b)(2)(A). In general, an area that missed the deadline—*i.e.*, failed to timely achieve attainment—must be "reclassified by operation of law" into a worse nonattainment status. *Id.* § 7511(b)(2)(A)(i)–(ii). And in some circumstances, EPA may sanction a State by taking away federal highway funds or by imposing further environmental regulations. *Id.* § 7509(a)–(b). So as a practical matter, States with nonattainment areas must "implement potentially expensive technology or expensive process changes to reduce pollution levels over a relatively short period of time." *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 146 (D.C. Cir. 2015) (per curiam).

B

Ground-level ozone forms when its precursors, nitrogen oxides and volatile organic compounds, react with sunlight. Power plants, motor vehicles, and combustion engines emit the precursors. Because ozone and its precursors travel easily through the atmosphere, nonattainment can occur hundreds of miles away from where the precursors were emitted.

In 2015, EPA reduced the NAAQS for ozone from 0.075 to 0.070 parts per million. National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292 (Oct. 26, 2015). For

6

this standard, EPA calculates design values based on three years of certified data.  *Id.* at 65,294.

At the same time, EPA issued a guidance memo on how to designate areas under the 2015 ozone standard.  The memo flagged five primary considerations: air quality, emissions, weather, topography, and jurisdictional boundaries.  J.A. 152.

In 2018, EPA promulgated its designations.  Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 Fed. Reg. 25,776 (June 4, 2018). The agency relied primarily on data from 2014 to 2016, which was "the most recent data that states were required to certify at the time the EPA notified the states of its intended modifications to their recommendations."  *Id.* at 25,779.  The designations went into effect in August 2018, starting the clock for nonattainment areas to attain.  *See* 40 C.F.R. § 51.1303(a).

C

In *Clean Wisconsin*, this Court held that EPA had acted arbitrarily in designating northern Weld County and El Paso County as attainment areas.

Weld is a large Colorado county located north of Denver. EPA concluded that the southern part of Weld County, but not the northern part, contributed to ozone pollution in the Denver metropolitan area.  So it folded the southern part into a nonattainment area encompassing greater Denver, and it designated the northern part as a standalone attainment area. We were skeptical because northern Weld County produced emissions that "approached or exceeded those of several entire counties in the nonattainment area."  964 F.3d at 1168.  And we found EPA's analysis of the local weather and topography to be shallow and inconsistent.  *Id.* at 1169.

7

El Paso County lies in western Texas and borders New Mexico. In 2018, EPA designated it as an attainment area. But when the *Clean Wisconsin* petitioners argued that El Paso contributed to nonattainment in Doña Ana County, New Mexico, EPA asked us to remand the designation for further explanation. We obliged but instructed the agency to revise its analysis "as expeditiously as practicable." 964 F.3d at 1176.

We remanded the northern Weld and El Paso designations without vacating either one. In declining to vacate, we perceived a "realistic possibility" that EPA would be able to justify the original designations on remand. 964 F.3d at 1177.

EPA promulgated the revised designations in November 2021. Additional Revised Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards: El Paso County, Texas and Weld County, Colorado, 86 Fed. Reg. 67,864 (Nov. 30, 2021) (Final Rule). These designations rest only on data that was available to EPA when it promulgated its original designations. *Id.* at 67,868–69. Based on this data, the agency concluded that the disputed areas contribute to nearby nonattainment. So EPA folded northern Weld County into the greater Denver marginal nonattainment area, and it folded El Paso County into a marginal nonattainment area that includes Doña Ana County. *Id.* at 67,873.

In doing so, EPA declined to recognize new attainment dates running from the date of the revised designations. Final Rule, 86 Fed. Reg. at 67,869. Because EPA designated Doña Ana County as a marginal nonattainment area in August 2018, its attainment date passed in August 2021—three months before the Final Rule folded El Paso County into that area. And because EPA recognized no new deadline, El Paso had no opportunity to meet its attainment date and thus timely attain.

8

EPA did extend one other deadline:  Because Texas "had no notice that it should prepare a marginal area SIP submission" for the expanded nonattainment area, EPA gave Texas one more year to prepare a SIP with planning requirements for a marginal nonattainment area.  *Id.*  EPA later concluded that the El Paso-Doña Ana County area had not attained the 2015 ozone standard as of its August 2021 attainment date.  Determination of Attainment by the Attainment Date But for International Emissions for the 2015 Ozone National Ambient Air Quality Standard; El Paso-Las Cruces, Texas-New Mexico, 88 Fed. Reg. 14,095 (Mar. 7, 2023).

Weld County and Texas seek review of the revised designations.  We have jurisdiction under 42 U.S.C. § 7607(b)(1).

II

Weld County offers two reasons for why EPA acted arbitrarily in designating the entire county as marginal nonattainment.  First, EPA failed to consider the most current available data.  Second, the older data do not support the designation.  Neither argument persuades.

A

On remand, EPA faced a choice about what data to use in considering whether northern Weld County contributes to nonattainment in Denver.  One option was to use only the certified data, gathered primarily from 2014 to 2016, that EPA had considered in making the original designations.  Another option was to consider the most recent certified data, which was gathered from 2015 to early 2021.  Weld contends that it was arbitrary for EPA to use the original data.  We disagree.

9

The Clean Air Act allows us to reverse rules that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. 7607(d)(9)(a). Under this familiar standard, copied from the Administrative Procedure Act, we uphold a rule if the agency "considered all relevant factors and articulated a rational connection between the facts found and the choice made." *Miss. Comm'n*, 790 F.3d at 150 (cleaned up).

EPA reasonably explained its decision to use only the data at its disposal while making the original designations. First, using the same data for localized redesignations would standardize its analysis and thus facilitate consistent treatment of all affected counties. J.A. 676. Second, using the original data would streamline the process and thus comply with our instruction in *Clean Wisconsin* to make any redesignations "as expeditiously as practicable." 964 F.3d at 1176; *see* J.A. 677.

*Mississippi Commission* bolsters EPA's choice. In that case, EPA used older data to designate a tristate nonattainment area despite possessing more recent, certified data from two of the three states. We declined "to declare irrational the EPA's conclusion that comparing data from the same time period would be more appropriate than analyzing data from different time periods in the same evaluation process." 790 F.3d at 160. So too here. If EPA could choose a matched dataset to classify a nonattainment area spanning multiple states, then it can also choose a matched dataset to classify a nonattainment area spanning multiple counties within a state.

We recognize that an agency generally must base its decisions on the best available data. But the question here is whether EPA was required to use one data set (the most recent certified data) in assessing northern Weld County's contribution to ozone pollution in greater Denver even though

10

it had used another data set (the certified data available at the time of the original designations) in assessing the contribution of at least eight other counties in the same area. In these circumstances, EPA plausibly explained why the benefits of a matched dataset—greater parity among counties and faster turnaround—make the original data a better choice than partial updating.

Weld County objects that EPA failed to act consistently. Weld notes that EPA refused to consider certain air quality data from 2014 to 2016. But this data was not made available to EPA until 2020 and 2021, so its exclusion was consistent with EPA's overall approach to stay within the record available when it made the original designations. Weld further notes that EPA, in making those designations, did consider some data from as late as 2017. EPA did so to the extent that some States chose to certify air quality data ahead of schedule. But because Colorado did not avail itself of this option, EPA based its 2018 designation on Colorado's certified data from 2014 to 2016. None of this suggests that EPA acted inconsistently or otherwise arbitrarily.

B

Weld County further argues that the certified data do not support including its northern part in the greater Denver nonattainment area. As noted above, EPA uses five factors to define areas and determine their attainment status. The last four factors (emissions, weather, topography, and jurisdictional boundaries) bear on the appropriate boundaries for a particular area. The first factor (air quality) bears on its appropriate designation. If EPA determines that one area contributes to another's nonattainment, it will combine those areas into a single nonattainment area.

11

Weld County does not challenge this overall framework for making the designations. Instead, it contends that EPA unreasonably applied the framework to conclude that northern Weld County contributes to Denver's nonattainment. We see no reason to disturb this highly technical judgment.

1. *Air Quality*. EPA assesses air quality by considering whether local monitors report NAAQS violations—*i.e.*, a design value above 0.070 parts per million. The presence of a single violating monitor justifies a nonattainment designation. In the Denver metropolitan area, EPA found five of them.

Weld contends that EPA erred by using outlier data associated with wildfires and stratospheric intrusions. EPA may disregard data that arises from an "exceptional event." 40 C.F.R. § 50.14. But to exclude data on this ground, a State must prove to EPA that an exceptional event "caused a specific air pollution concentration at a particular air quality monitoring location." *Id.* § 50.14(a)(1)(ii). Colorado made no effort to link the Denver monitor readings to any exceptional event. To the contrary, in opposing the Final Rule, Colorado acknowledged its failure to submit any "exceptional event demonstrations." J.A. 631.

2. *Emissions*. This factor primarily considers the origin and quantity of precursor emissions. Data showed that Weld County produces more than three times the emissions of the next-highest-emitting county in the Denver metropolitan area. And although northern Weld County accounts for only a small fraction of the County's overall emissions, we noted in *Clean Wisconsin* that a small fraction of a large number can still be a large number. 964 F.3d at 1168.

On remand, EPA concluded that northern Weld County produces significant emissions because (a) the County

12

produces far more emissions than any nearby county, (b) most of its emissions come from oil-and-gas wells, and (c) nearly eight percent of the County's 36,682 wells are in its northern portion.  Furthermore, northern Weld County has three individual sources that each emit over 100 tons of ozone precursors per year.  In our view, these facts support EPA's revised conclusion.

Weld again claims inconsistency.  It objects that EPA failed to reevaluate emissions from the northern part of nearby Larimer County, which EPA excluded from the Denver nonattainment area.  But no data in the relevant set compares the emissions of northern Weld and northern Larimer counties. Instead, Weld flags data comparing the combined emissions of northern Weld and northern Larimer counties to emissions from the Denver nonattainment area.  We cannot infer from this that northern Larimer's emissions exceed northern Weld's.

Weld continues that northern Larimer County is a stronger candidate for inclusion in the nonattainment area because it has a higher population density and more vehicle miles travelled than does northern Weld County.  But as EPA explained, northern Larimer and northern Weld Counties differ in other important respects, such as topography, that cut in favor of designating only northern Weld County.  To establish arbitrariness based on inconsistency, Weld must show that EPA "treated genuinely similar counties dissimilarly." *Miss. Comm'n*, 790 F.3d at 169 (cleaned up).  Given the various cross-cutting considerations we have noted, Weld has not made that showing.

3.  *Weather.*  EPA considers how meteorological conditions affect the movement of ozone and its precursors through the atmosphere.  EPA uses a model to determine this movement from data about wind speed and direction,

13

temperature, humidity, and air pressure.  The model predicts the paths, known as "back trajectories," traveled by air parcels that reach a violating monitor.  *Clean Wisc.*, 964 F.3d at 1155.  If the model's projections show air parcels moving from a region to the violating monitor, that supports including the region in the nonattainment area.  According to EPA, the model indicates that emissions from northern Weld County move into the Denver nonattainment area.

Weld contends that EPA ignored certain model projections suggesting otherwise.  But EPA did consider these projections, and it offered three sound reasons for discounting them:  First, the projections missed all back trajectories from one of the violating monitors.  Second, they missed back trajectories from 2016.  Third, they missed back trajectories from each day when a monitor registered an above-NAAQS design value.  In any event, EPA further explained that even the County's preferred data suggest that air flow from northern Weld County "affect[s] violating monitors" in the Denver area.  J.A. 682.

Weld also highlights supposed flaws in EPA's data.  First, it complains that the data tracks air parcels arriving at a monitor only during a single hour of the day.  But Weld did not raise this argument below, and we thus need not consider it.  In any event, EPA sensibly focused on the time of day when ozone concentrations were highest.  Plus, data from other times could only expand the possible source regions; they could not change the critical fact that some air parcels travel from northern Weld County to greater Denver.  Second, Weld objects that EPA did not try to predict how terrain near violating monitors might influence particle trajectory.  But the model seeks to measure the paths traveled by air parcels to a violating monitor; it is not concerned with how terrain near violating monitors impacts particle trajectory.

14

4. *Topography*. In originally excluding northern Weld County from the Denver nonattainment area, EPA claimed that its boundary line tracked an elevation called the Cheyenne Ridge, which assertedly blocks local emissions from reaching Denver. But in *Clean Wisconsin*, we found that the ridge was in the northernmost part of Weld County, along the boundary between Colorado and Wyoming. *See* 964 F.3d at 1168.

On remand, EPA agreed with our assessment and then concluded that the local topography funneled, rather than impeded, the flow of air from Northern Weld County to greater Denver. Weld objects that EPA again misplaced the ridgeline, but it provides no convincing response to the evidence already credited by this Court.

5. *Jurisdictional boundaries.* The last main factor that EPA considers is existing jurisdictional boundaries. All else equal, administration is easier when area designations track preexisting boundaries such as county lines. So here, EPA reasoned, such boundaries support combining northern and southern Weld County.

The County objects that EPA failed to quantify the emissions contributions of its northern portion. But we have allowed EPA to designate nonattainment areas without isolating and quantifying the exact emissions from each subpart of a jurisdiction. *Catawba Cnty., N.C. v. EPA*, 571 F.3d 20, 40 (D.C. Cir. 2009). Weld notes considerations such as its size and uneven elevation. But we cannot conclude that EPA was legally compelled to subdivide the County, particularly given some affirmative evidence that northern Weld County does contribute to Denver's nonattainment.

15

III

Texas argues that the Final Rule is impermissibly retroactive because, in December 2021, it folded El Paso County into a nonattainment area for which the August 2021 attainment date had already passed. We agree.

A

Agencies cannot promulgate retroactive rules without express statutory authorization. *See*, *e.g.*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 224 (1988) (Scalia, J., concurring). And this Court has held that nothing in the Clean Air Act gives EPA "the unusual ability to implement rules retroactively." *Sierra Club v. Whitman*, 285 F.3d 63, 68 (D.C. Cir. 2002). So, if the Final Rule operates retroactively as applied to El Paso, then it cannot stand.

A rule operates retroactively when it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994). In other words, "retroactive rules alter the past legal consequences of past actions." *Arkema, Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 219 (1988) (Scalia, J., concurring)) (cleaned up); *see Landgraf*, 511 U.S. at 269–70 ("the court must ask whether the new provision attaches new legal consequences to events completed before its enactment"). On the other hand, it is not enough that a rule "upsets expectations based in prior law," *id.* at 269, or "draws upon antecedent facts for its operation," *id.* at n.24 (cleaned up).

16

The Final Rule is impermissibly retroactive.  Recall that a marginal nonattainment designation gives rise to an attainment date that is three years after the designation.  42 U.S.C. § 7511(a).  If a State misses the deadline, EPA must reclassify the designated area to a worse nonattainment status "by operation of law."  *Id.* § 7511(b)(2)(A)(i)–(ii).  And the reclassification triggers the various additional burdens that come with the downgraded status.  *Id.* § 7511a(b)(1).  By design, this scheme provides strong incentives for States with nonattainment areas to use the three-year runway to achieve attainment.  And 17 of the 36 areas designated as marginal nonattainment for the 2008 ozone NAAQS did timely attain. *See* Determinations of Attainment by the Attainment Date, 81 Fed. Reg. 26,697, 26,700 (May 4, 2016).

Here, Texas never had the requisite opportunity to reach timely attainment.  In August 2018, EPA classified El Paso as an attainment area.  Texas thus had no reason to plan for improving El Paso's air quality at that time.  Yet in November 2021, EPA folded El Paso into an existing nonattainment area—three months *after* that area's August 2021 attainment deadline had passed.  And despite considering the question at length, EPA refused to recognize an attainment date for El Paso running from the date of its new nonattainment designation. J.A. 661–63.  Thus, despite designating El Paso as a nonattainment area in November 2021, EPA effectively backdated to August 2018 the start of its three-year runway for reaching attainment.  The Final Rule thereby imposed liabilities on Texas's inaction between August 2018 and August 2021—*i.e.*, it imposed on Texas the consequences of missing a compliance deadline that passed before the underlying legal obligation was imposed.

Our caselaw confirms that the Final Rule operates retroactively.  We have made clear that because EPA lacks

17

statutory authority to promulgate retroactive rules, it cannot impose on States new obligations with compliance deadlines already in the past.  Three decisions prove this point.

Start with *Sierra Club v. Whitman*.  In 1991, EPA designated St. Louis as a moderate nonattainment area, triggering a 1996 attainment date.  After EPA missed its own 1997 deadline for determining whether St. Louis had timely attained, the agency refused to backdate to that deadline its later determination that the city had not timely attained. Upholding the refusal to backdate, we invoked the principle that EPA cannot engage in "retroactive rulemaking."  285 F.3d at 68.  Likewise, we explained that the requested backdating would have "likely impose[d] large costs on the States, which would face fines and suits for not implementing air pollution prevention plans in 1997, even though they were not on notice at the time" of any legal obligation to do so.  *Id.*

The same logic guided our decision in *Sierra Club v. EPA*, 356 F.3d 296 (D.C. Cir. 2004).  In that case, EPA downgraded the District of Columbia from serious to severe nonattainment. But because the deadline for submitting a severe nonattainment SIP had already passed, EPA gave the District a new deadline for doing so.  We again rejected a contention that the original deadline should control—which, we said, would make the reclassification retroactive "by holding the States in default of their submission obligations before the events necessary to trigger that obligation (reclassification) occurred."  *Id.* at 309 (cleaned up).

Last is *WildEarth Guardians v. EPA*, 830 F.3d 529 (D.C. Cir. 2016).  After we held that EPA had been using the wrong statutory scheme to regulate fine particulate matter, the agency adjusted the SIP and attainment deadlines under the correct scheme "to avoid treating states as having already missed

18

deadlines of which they were never aware." *Id.* at 531. We rejected a contention that EPA should have assumed the correct framework had been applied all along. In doing so, we described the adjustments as necessary to avoid imposing "retroactive consequences on states." *Id.* at 540. We also rejected a proposed distinction between "present findings of noncompliance" and the sort of "backdated findings" in the *Sierra Club* cases. *Id.* In either instance, we reasoned, "States would be held to long-passed deadlines of which they were unaware, with meaningful legal consequences." *Id.* at 541.

B

EPA's responses are unpersuasive. EPA objects that Texas did not preserve its retroactivity argument below. But in opposing the proposed Final Rule, Texas could not have been much clearer. It argued that the El Paso County area "should not be tied retroactively to implementation deadlines that existed prior to the area being designated as nonattainment." J.A. 614. And it warned that "[a]ny attempt to 'link' El Paso County to the [Doña Ana] nonattainment designation implementation dates would exceed" EPA's statutory authority. J.A. 615. The Texas Association of Manufacturers echoed these concerns. It objected that EPA lacked statutory authority to eliminate Texas's three-year attainment runway "[b]y retroactively attaching Dona Ana County's attainment date to El Paso." J.A. 411. This comment also preserved the retroactivity issue. *See Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 948 n.12 (D.C. Cir. 2004) ("It is sufficient that an issue was raised by any commenter; the party petitioning for judicial review need not have done so itself.").

On the merits, EPA contends that its classification of El Paso as a nonattainment area imposed only prospective obligations on Texas—the requirement to submit a new SIP,

19

for which EPA imposed a new deadline, and the future planning requirements associated with nonattainment status. But as discussed, EPA refused to set an attainment date keyed to the November 2021 designation. Texas thus found itself in the unenviable position of learning in November 2021 that El Paso County either had to have reached attainment by its August 2021 attainment date or would suffer the consequences flowing "by operation of law" from having missed that deadline. 42 U.S.C. § 7511(b)(2)(A). To be sure, a downgrade does not happen by itself, but only after EPA determines that the area has missed the deadline. *See id.* But EPA's decision to backdate El Paso's nonattainment designation retroactively adjusted Texas's legal rights by increasing the State's exposure to the harsh consequences that follow from failing to meet an already past deadline.

We recognize that El Paso may yet avoid the additional burdens flowing from a downgraded attainment classification. The Clean Air Act provides an exception to the mandatory downgrade if a State proves to EPA that the nonattainment area would have met its deadline "but for emissions emanating from outside of the United States." 42 U.S.C. § 7509a(a)(2); *see* Implementation of the 2015 National Ambient Air Quality Standards for Ozone, 83 Fed. Reg. 62,998, 63,009 & n.24 (Dec. 6, 2018). Several months after oral argument, EPA proposed a rule reflecting its tentative judgment that the El Paso-Doña Ana area would have timely attained but for emissions from Mexico. Determination of Attainment by the Attainment Date But for International Emissions for the 2015 Ozone National Ambient Air Quality Standard, 88 Fed. Reg. at 14,101. This proposed rule does not change our analysis. For one thing, it is not final and thus currently lacks the force of law. In any event, the nonattainment designation still created substantial legal exposure for Texas based on its inaction between August 2018 and August 2021. The fact that a distinct affirmative

20

defense might extinguish it does not change the retroactive character of the rule creating the exposure in the first place.

The intervenors press two further retroactivity points, which we reject.  First, they claim Texas knew all along that El Paso's status could change.  For support, they invoke *Treasure State Resource Industry Association v. EPA*, 805 F.3d 300 (D.C. Cir. 2015), which held that a NAAQS designation is not impermissibly retroactive just because it relies on old data.  *Id.* at 305–06; *see also Landgraf*, 511 U.S. at 269 n.24.  But Texas does not contend that El Paso's nonattainment designation in November 2021 was impermissibly retroactive because it was based on air quality data from earlier years.  Instead, Texas contends that the designation was impermissibly backdated to August 2018.  Moreover, agencies always may prospectively change their regulations, just as legislatures always may prospectively amend their statutes.  If that possibility were enough to vitiate retroactivity concerns, the presumption against retroactive statutes and rules would amount to nothing.

Second, the intervenors object that Texas failed to identify any different steps it would have taken if EPA had designated El Paso as a nonattainment area in 2018.  But Texas need not make that showing.  As explained above, a rule that "attaches new legal consequences to events completed before its enactment" is retroactive, *see Landgraf*, 511 U.S. at 269–70, and thus "invalid unless specifically authorized."  *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 159 (D.C. Cir. 2010).  On the other hand, a rule that merely "upsets expectations based in prior law" is not retroactive in the same way; it is instead only "secondarily retroactive," and thus "invalid only if arbitrary and capricious."  *Id.* (quoting *Landgraf*, 511 U.S. at 269); *see Nat'l Cable & Telecomm. Ass'n v. FCC*, 567 F.3d 659, 670–71 (D.C. Cir. 2009).  In reviewing a rule with such *secondary* retroactivity, we must

21

balance the harm of "upsetting prior expectations" against any
benefits of applying the rule "to those preexisting interests."
*Nat'l Cable & Telecomm. Ass'n*, 567 F.3d at 670; *see also
Bowen*, 488 U.S. at 220 (Scalia, J., concurring) ("A rule that
has unreasonable secondary retroactivity—for example,
altering future regulation in a manner that makes worthless
substantial past investment incurred in reliance upon the prior
rule—may for that reason be 'arbitrary' or 'capricious.'"). For
this inquiry, the extent of any reliance or expectation interests
is obviously critical. But the intervenors cite no case
suggesting that a statute or regulation exhibiting *primary*
retroactivity, by changing the past legal consequences of past
actions, is presumptively valid absent a showing of case-
specific reliance by adversely affected parties.

By backdating El Paso's 2021 nonattainment designation
to 2018, EPA changed the legal consequences of Texas's
inaction over that past period. The designation thus exhibited
primary retroactivity—and was invalid for that reason.

IV

Our final task is to determine the appropriate remedy. The
Clean Air Act permits us to "reverse" any EPA "action" found
to be arbitrary. 42 U.S.C. 7607(d)(9). Texas asks us to reverse
the Final Rule itself. But regulations—like statutes—are
presumptively severable: If parts of a regulation are invalid
and other parts are not, we set aside only the invalid parts unless
the remaining ones cannot operate by themselves or unless the
agency manifests an intent for the entire package to rise or fall
together. This is true for agency rules in general, *e.g.*, *Finnbin,
LLC v. CPSC*, 45 F.4th 127, 136 (D.C. Cir. 2022); *Carlson v.
Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019),
and for EPA rules in particular, *e.g.*, *Virginia v. EPA*, 116 F.3d
499, 500–01 (D.C. Cir. 1997); *Davis Cnty. Solid Waste Mgmt.*

22

*v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997). Moreover, judicial remedies should be "no more burdensome to the defendant than necessary to provide complete relief" to the plaintiffs or petitioners. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (remedies "operate with respect to specific parties" rather than "on legal rules in the abstract") (cleaned up).

Under these standards, the revised Weld County and El Paso designations are clearly severable. They adjust the geographic boundaries, and thereby the attainment status, of areas hundreds of miles apart. Each revised designation functions perfectly well on its own, and we have no reason to think that EPA would want both the revised designations to fall simply because one of them is invalid. For these reasons, we decline to disturb the Weld County designation.

A distinct severability question relates to the El Paso nonattainment designation. As we have explained, its impermissible retroactivity arises not from the designation itself, but from the designation combined with EPA's refusal to recognize a new attainment date. We could cure the legal violation by reversing either decision. But since EPA has strenuously argued that a new attainment date would create both fairness and administrability concerns, J.A. 662–64, we are reluctant to force that option on EPA. Instead, we think it more prudent simply to reverse the nonattainment designation, leaving EPA free on remand to decide whether to make a new designation with its own attainment date or simply to let well enough alone.

V

For these reasons, we deny Weld County's petition for review, grant Texas's petition for review, and reverse the Final

23

Rule insofar as it designates El Paso County to be a marginal nonattainment area.

*So ordered.*