# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF TEXAS and  )
TEXAS COMMISSION ON  )
ENVIRONMENTAL QUALITY,  )
                                         )
*Petitioners*,  )
                                         )
v.  )   No. 22-1013
                                         )
UNITED STATES  )
ENVIRONMENTAL  )
PROTECTION AGENCY and  )
MICHAEL S. REGAN,  )
Administrator, United States  )
Environmental Protection  )
Agency,  )
                                         )
*Respondents*.  )

## PETITION FOR REVIEW

In accordance with 42 U.S.C. § 7607(b)(1), Federal Rule of Appellate Procedure 15, and D.C. Circuit Rule 15(a)(1), Petitioners the State of Texas and the Texas Commission on Environmental Quality hereby petition this Court for review of the final action taken by Respondents United States Environmental Protection Agency and Michael S. Regan, Administrator, United States Environmental Protection Agency, entitled "Additional Revised Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards: El Paso County, Texas and Weld County, Colorado," (attached hereto), published at 86 Fed. Reg. 67,864 (Nov. 30, 2021). Petitioners challenge the portion of the rule applicable to Texas.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Judd E. Stone II
Solicitor General

Brent Webster
First Assistant Attorney General

Bill Davis
Deputy Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Michael R. Abrams
Michael R. Abrams
Assistant Solicitor General
Michael.Abrams@oag.texas.gov

Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality

2

## Certificate of Service

I hereby certify that I caused a true and correct copy of this Petition for Review to be served on January 28, 2022, by United States first-class mail on the following:

> Michael S. Regan, Administrator
> United States Environmental Protection Agency
> Office of the Administrator
> Mail Code 1101A
> 1200 Pennsylvania Avenue NW
> Washington, D.C. 20460
>
> Office of General Counsel
> United States Environmental Protection Agency
> Mail Code 2310A
> 1200 Pennsylvania Avenue NW
> Washington, D.C. 20460
>
> The Honorable Merrick B. Garland
> Attorney General of the United States
> U.S. Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530

/s/ Michael R. Abrams
Michael R. Abrams

| International money transfer service (Sure Money) | Fee |
|---|---|
| Change of Recipient | 19.95 |

The Postal Service hereby adopts the following changes to *Mailing Standards of the United States Postal Service,* International Mail Manual (IMM), which is incorporated by reference in the *Code of Federal Regulations.* See 39 CFR 20.1.

**List of Subjects in 39 CFR Part 20**

Foreign relations, International postal services.

Accordingly, 39 CFR part 20 is amended as follows:

**PART 20—[AMENDED]**

■ 1. The authority citation for 39 CFR part 20 continues to read as follows:

**Authority:** 5 U.S.C. 552(a); 13 U.S.C. 301–307; 18 U.S.C. 1692–1737; 39 U.S.C. 101, 401, 403, 404, 407, 414, 416, 3001–3011, 3201–3219, 3403–3406, 3621, 3622, 3626, 3632, 3633, and 5001.

■ 2. Revise the following sections of the *Mailing Standards of the United States Postal Service,* International Mail Manual (IMM) as follows:

\* \* \* \* \*

**Mailing Standards of the United States Postal Service, International Mail Manual (IMM)**

\* \* \* \* \*

**2 Conditions for Mailing**

\* \* \* \* \*

**220 Priority Mail Express International**

\* \* \* \* \*

**222 Eligibility**

\* \* \* \* \*

[Revise 222.7 to read as follows:]

**222.7 Extra Services**

**222.71 Merchandise Insurance**

Additional merchandise insurance coverage above $200, up to a maximum of $5,000, may be purchased at the sender's option. See Exhibit 322.2 for individual country merchandise insurance limits. See Notice 123, *Price List,* for the fee schedule for optional Priority Mail Express International merchandise insurance coverage.

**222.72 Tracking Plus**

Customers may purchase USPS Tracking Plus service for certain pieces, when available, online at *usps.com* or through a Shipping Services File. For pricing, see Notice 123, *Price List.*

\* \* \* \* \*

**230 Priority Mail International**

\* \* \* \* \*

**232 Eligibility**

\* \* \* \* \*

**232.9 Extra Services**

\* \* \* \* \*

[Add a new section to read as follows:]

**232.93 Tracking Plus**

Customers may purchase USPS Tracking Plus service for certain pieces, when available, online at *usps.com* or through a Shipping Services File. For pricing, see Notice 123, *Price List.*

\* \* \* \* \*

**250 First-Class Package International Service**

\* \* \* \* \*

**252 Eligibility**

\* \* \* \* \*

**252.5 Extra Services**

\* \* \* \* \*

[Add a new section to read as follows:]

**252.54 Tracking Plus**

USPS Tracking Plus service is available for certain pieces sent via single-piece First-Class Package International Service for which Electronic USPS Delivery Confirmation International Service is available. Customers may purchase USPS Tracking Plus service for certain pieces, when available, online at *usps.com* or through a Shipping Services File. For pricing, see Notice 123, *Price List.*

\* \* \* \* \*

**292 International Priority Airmail (IPA) Service**

\* \* \* \* \*

**292.4 Mail Preparation**

\* \* \* \* \*

**292.45 IPA Foreign Office of Exchange Codes and Price Groups**

\* \* \* \* \*

Exhibit 292.45a

**IPA Foreign Office of Exchange Codes and Price Groups**

[In alphabetical order, add an entry for Sudan to read as follows:]

| Country labeling name | Foreign Office of Exchange code | Price group |
|---|---|---|
| \* \* | \* \* | \* |
| Sudan | KRT | 5 |
| \* \* | \* \* | \* |

\* \* \* \* \*

**3 Extra Services**

\* \* \* \* \*

[Add a new part to read as follows:]

**390 Tracking Plus**

The Postal Service offers USPS Tracking Plus service for certain international products, allowing customers to request the Postal Service retain scan data, or scan and signature data, for certain pieces beyond the Postal Service's standard data retention period, for up to 7 years. USPS Tracking Plus service is available for certain pieces sent via Priority Mail Express International service, Priority Mail International service, and single-piece First-Class Package International Service for which Electronic USPS Delivery Confirmation International Service is available, and certain pieces for those services for which insurance has been purchased (not to include Global Express Guaranteed service). For pricing, see Notice 123, *Price List.* Customers may request USPS Tracking Plus service for certain pieces, when available, online at *usps.com* or through a Shipping Services File.

\* \* \* \* \*

We will publish an appropriate amendment to 39 CFR part 20 to reflect these changes.

**Ruth Stevenson,**
*Chief Counsel, Ethics and Legal Compliance.*

[FR Doc. 2021–25978 Filed 11–29–21; 8:45 am]

**BILLING CODE 7710–12–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 81**

[EPA–HQ–OAR–2017–0548; FRL: 8260.1–02–OAR]

**Additional Revised Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards: El Paso County, Texas and Weld County, Colorado**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This final action revises the initial air quality designations for two counties associated with two nonattainment areas for the 2015 primary and secondary National Ambient Air Quality Standards (NAAQS) for ozone. In a July 10, 2020, decision, the District of Columbia Circuit Court remanded to the Environmental Protection Agency (EPA

or Agency), but did not vacate, the April 30, 2018, designations for 16 counties associated with nine nonattainment areas located in seven states. In response, the EPA has re-evaluated the designations for the remanded counties by applying a uniform, nationwide analytical approach and interpretation of the designation provisions of the Clean Air Act (CAA) in considering the specific facts and circumstances of the areas using only data and information available at the time of the original designations. In this final action, the EPA is revising the boundaries of two nonattainment areas, affecting the designation status of two counties in two separate states (Colorado and Texas). The EPA addressed the 14 additional remanded counties in a previous **Federal Register** document.

**DATES:** The effective date of this rule is December 30, 2021.

**ADDRESSES:** The EPA has established a public docket for these ozone designations at *https://www.regulations.gov* under Docket ID No. EPA–HQ–OAR–2017–0548. Although listed in the docket index, some information is not publicly available, *e.g.,* Confidential Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form.

Out of an abundance of caution for members of the public and our staff, the EPA Docket Center and Reading Room are currently closed to the public, with limited exceptions, to reduce the risk of transmitting COVID–19. The Docket Center staff will continue to provide remote customer service via email, phone, and webform. For further information on EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets.*

In addition, the EPA has established a website for the designations for the 2015 ozone NAAQS at *https://www.epa.gov/ozone-designations.* The website includes the EPA's final revised designations action, technical support documents, revised responses to comments and other related information.

**FOR FURTHER INFORMATION CONTACT:** For general questions concerning this action, contact Carla Oldham, Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Mail Code C539–01, Research Triangle Park, N.C. 27711, phone number (919) 541–3347 or by email at: *oldham.carla@epa.gov.* The following EPA contacts can answer questions regarding areas affiliated with a particular EPA Regional office:

Region 6—Carrie Paige, telephone (214) 665–6521, email at *paige.carrie@epa.gov.*

Region 8—Abby Fulton, telephone (303) 312–6563, email at *fulton.abby@epa.gov.*

| Regional offices | Affected state(s) |
| --- | --- |
| EPA Region 6—State Planning & Implementation Branch, 1201 Elm Street, Dallas, Texas 75270 ........................................... | Texas. |
| EPA Region 8—Air Quality Planning Branch, 1595 Wynkoop Street, Denver, Colorado 80202 .............................................. | Colorado. |

Most of the EPA's offices are closed to reduce the risk of transmitting COVID–19, but staff remain available via telephone and email. The EPA encourages the public to review information related to the EPA's final action responding to the July 10, 2020, Court Decision online at *https://www.epa.gov/ozone-designations* and in the public docket at *https://www.regulations.gov* under Docket ID No. EPA–HQ–OAR–2017–0548.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

The following is an outline of the Preamble.

I. Preamble Glossary of Terms and Acronyms
II. What is the purpose of this action?
III. What is ozone and how is it formed?
IV. What are the 2015 ozone NAAQS and the health and welfare concerns they address?
V. What are the CAA requirements for air quality designations?
VI. What is the chronology for this designations action and what guidance did the EPA provide?
VII. What air quality data has the EPA used to designate the remanded areas for the 2015 ozone NAAQS?
VIII. What are the ozone air quality classifications and implementation dates?
IX. Environmental Justice Considerations
X. Statutory and Executive Order Reviews

A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
B. Paperwork Reduction Act (PRA)
C. Regulatory Flexibility Act (RFA)
D. Unfunded Mandates Reform Act (UMRA)
E. Executive Order 13132: Federalism
F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks
H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution, or Use
I. National Technology Transfer and Advancement Act (NTTAA)
J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
K. Congressional Review Act (CRA)
L. Judicial Review

**I. Preamble Glossary of Terms and Acronyms**

The following are abbreviations of terms used in the preamble.

APA   Administrative Procedure Act
CAA   Clean Air Act
CFR   Code of Federal Regulations
CRA   Congressional Review Act
DC   District of Columbia
EPA   Environmental Protection Agency
FR   Federal Register
NAAQS   National Ambient Air Quality Standards
NTTAA   National Technology Transfer and Advancement Act
ppm   Parts per million
PRA   Paperwork Reduction Act
RFA   Regulatory Flexibility Act
SIP   State Implementation Plan
TAR   Tribal Authority Rule
TSD   Technical Support Document
UMRA   Unfunded Mandate Reform Act
U.S.   United States
U.S.C.   United States Code

**II. What is the purpose of this action?**

The purpose of this final action is to announce and promulgate revised 2015 ozone NAAQS designations for two counties in response to the July 10, 2020, decision by the District of Columbia Circuit Court that remanded the counties to the EPA for further consideration. The affected counties were initially designated on April 30, 2018. The EPA addressed the 14 additional remanded counties in a previous **Federal Register** document (86 FR 31438; June 14, 2021).

On October 1, 2015, the EPA promulgated revised primary and secondary NAAQS for ozone (80 FR 6592; October 26, 2015). In that action, the EPA strengthened both standards to a level of 0.070 parts per million (ppm), while retaining their indicators, averaging times, and forms. The EPA revised the ozone standards based on an

integrated assessment of an extensive body of new scientific evidence, which substantially strengthens our knowledge regarding ozone-related health and welfare effects, the results of exposure and risk analyses, the advice of the Clean Air Scientific Advisory Committee and consideration of public comments.

The process for designating areas following promulgation of a new or revised NAAQS is contained in the CAA section 107(d) (42 U.S.C. 7407(d)). After promulgation of a new or revised NAAQS, the CAA requires the EPA to determine if areas in the country meet the new standards. Accordingly, the EPA designated all areas of the country as to whether they met, or did not meet, the NAAQS in three rounds.[1]

Several environmental and public health advocacy groups, three local government agencies, and the state of Illinois filed a total of six petitions for review challenging the EPA's 2015 ozone NAAQS designations promulgated on April 30, 2018. The District of Columbia Circuit Court consolidated the petitions into a single case, *Clean Wisconsin* v. *EPA,* 964 F.3d 1145 (D.C. Cir. 2020). Collectively, the petitioners challenged aspects of the EPA's final designations for 17 counties associated with nine nonattainment areas. The petitioners primarily argued that the EPA improperly designated counties (in whole or part) as attainment that should have been designated as nonattainment because of contribution to nearby counties with violating monitors. In its response brief, the EPA requested voluntary remand of the final designation decisions for 10 counties associated with four nonattainment areas to further review those designations.

On July 10, 2020, the District of Columbia Circuit Court granted the EPA's requests for voluntary remand and also remanded several other counties (*see Clean Wisconsin,* 964 F.3d 1145). In total, the Court remanded back to the EPA 16 counties associated with nine nonattainment areas. The Court did not vacate the initial April 30, 2018, designations, but required the EPA to "issue revised designations as expeditiously as practicable." In response to the Court decision, the EPA re-evaluated the existing technical record, including data and information, that was used for the initial April 2018 designations under a uniform, nationwide analytical approach, to support either revising or affirming the designations for these remanded counties. Table 1 summarizes the EPA's revised 2015 ozone NAAQS designations for the two remanded counties that are addressed in this **Federal Register** document. The technical support documents (TSDs) that describe the re-evaluation of these counties are included in the public docket. The amended 40 CFR part 81 tables for the revised designations, which appear in the regulatory tables included at the end of this final rule, identify the revised designation for the two remanded counties and the classification for the associated nonattainment areas.

TABLE 1—REMAND DESIGNATIONS FOR EL PASO COUNTY, TEXAS AND WELD COUNTY, COLORADO FOR THE 2015 OZONE NAAQS

| Nonattainment area name | Remanded county | April 2018 designation | Remand designation |
|---|---|---|---|
| El Paso-Las Cruces, Texas-New Mexico a | El Paso County, Texas | Full county attainment | Full county nonattainment. |
| Denver Metro/North Front Range, Colorado | Weld County, Colorado | Partial county nonattainment | Full county nonattainment. |

a The EPA is expanding the initially designated Doña Ana County (Sunland Park Area), New Mexico nonattainment area to include El Paso County, Texas, and for clarity is renaming the area as the El Paso-Las Cruces, Texas-New Mexico nonattainment area.

For the 14 remanded counties addressed in a previous action, as discussed further in Sections V and VI of this document, the EPA exercised its authority to take final action under section 107(d) of the CAA. For the remaining two remanded counties addressed in this action (El Paso County, Texas and Weld County, Colorado), a different process is required. As discussed in Section V of this document, CAA section 107(d) specifies that whenever the EPA Administrator intends to make a modification to a state's designation recommendation, the EPA must notify the state and provide the state with the opportunity to submit additional information to demonstrate why the EPA's intended modification is inappropriate. The EPA is required to give the notification no later than 120 days before promulgating the final designation, including any modification thereto.

After re-evaluating the El Paso County, Texas and Weld County, Colorado areas in response to the court remand, the EPA notified Texas and Colorado of the Agency's intent to make modifications to the state recommendations for those two counties and conducted the required 120-day notification process. CAA section 107(d)(1)(B)(ii). The EPA also sent a letter to New Mexico notifying that state of the EPA's intended modification of Texas's attainment recommendation that would expand the boundary of the existing Doña Ana County (Sunland Park Area), NM nonattainment area to include El Paso County, TX and, thus, become a multi-state nonattainment area. The EPA also issued a notice of availability for these letters and offered a public comment period (86 FR 31460; June 14, 2021).

### III. What is ozone and how is it formed?

Ground-level ozone is a gas that is formed by the reaction of volatile organic compounds (VOCs) and oxides of nitrogen ($NO_X$) in the atmosphere in the presence of sunlight. These precursor emissions are emitted by many types of pollution sources, including power plants and industrial emissions sources, on-road and off-road motor vehicles and engines, and smaller sources, collectively referred to as area sources. Ozone is predominately a summertime air pollutant. However, high ozone concentrations have also been observed in cold months, where a few areas in the Western United States (U.S.) have experienced high levels of local VOC and $NO_X$ emissions that have formed ozone when snow is on the ground and temperatures are near or below freezing. Ozone and ozone precursors can be transported to an area from sources in nearby areas or from

---

[1] The EPA designated areas for the 2015 ozone NAAQS in three rounds, resulting in 52 nonattainment areas. In Round 1 (82 FR 54232; November 6, 2017), the EPA designated 2,646 counties, two separate tribal areas and five territories as attainment/unclassifiable, and one area as unclassifiable. In Round 2 (83 FR 25776; April 30, 2018), the EPA designated 51 nonattainment areas, one unclassifiable area, and all remaining areas as attainment/unclassifiable, except for the eight counties in the San Antonio, Texas area. In Round 3 (83 FR 35136; July 17, 2018), the EPA designated one county in the San Antonio area as nonattainment and the other seven counties as attainment/unclassifiable.

sources located hundreds of miles away. For purposes of determining ozone nonattainment area boundaries, the CAA requires the EPA to include areas that contribute to nearby violations of the NAAQS.

## IV. What are the 2015 ozone NAAQS and the health and welfare concerns they address?

On October 1, 2015, the EPA revised both the primary and secondary NAAQS for ozone to a level of 0.070 ppm (annual fourth-highest daily maximum 8-hour average concentration, averaged over 3 years).[2] The level of the ozone NAAQS previously set in 2008 is 0.75 ppm. The 2015 ozone NAAQS retain the same general form and averaging time as the 2008 ozone NAAQS.

The primary ozone standards provide protection for children, older adults, and people with asthma or other lung diseases, and other at-risk populations against an array of adverse health effects that include reduced lung function, increased respiratory symptoms and pulmonary inflammation; effects that contribute to emergency department visits or hospital admissions; and mortality. The secondary ozone standards protect against adverse effects to the public welfare, including those related to impacts on sensitive vegetation and forested ecosystems.

## V. What are the CAA requirements for air quality designations?

After the EPA promulgates a new or revised NAAQS, the EPA is required to designate all areas in the country as nonattainment, attainment, or unclassifiable, for that NAAQS pursuant to section 107(d)(1)–(2) of the CAA. Section 107(d)(1)(A)(i) of the CAA defines a *nonattainment* area as an area that does not meet the NAAQS or that contributes to a nearby area that does not meet the NAAQS. An *attainment* area is defined by the CAA as any area that meets the NAAQS and does not contribute to any nearby areas that do not meet the NAAQS. *Unclassifiable* areas are defined by the CAA as those that cannot be classified on the basis of available information as meeting or not meeting the NAAQS.

Historically for ozone, the EPA has designated most areas that do not meet the definition of nonattainment as unclassifiable/attainment. This category includes areas that have air quality monitoring data meeting the NAAQS and areas that do not have monitors but for which the EPA has no evidence that the areas may be violating the NAAQS or contributing to a nearby violation. In the designations for the 2015 ozone NAAQS, the EPA reversed the order of the label to attainment/unclassifiable to better convey the definition of the designation category and to more easily distinguish the category from the separate unclassifiable category. In a few instances, based on circumstances where some monitoring data are available but are not sufficient for a determination that an area is or is not attaining the NAAQS, the EPA has designated an area as unclassifiable.

The EPA notes that CAA section 107(d) provides the Agency with discretion to determine how best to interpret the terms in the definition of a nonattainment area (*e.g.,* "contributes to" and "nearby") for a new or revised NAAQS, given considerations such as the nature of a specific pollutant, the types of sources that may contribute to violations, the form of the standards for the pollutant, and other relevant information. In particular, the EPA's position is that the statute does not require the Agency to establish bright line tests or thresholds for what constitutes "contribution" or "nearby" for purposes of designations.[3]

Similarly, the EPA's position is that the statute permits the EPA to evaluate the appropriate application of the term "area" to include geographic areas based upon full or partial county boundaries, as may be appropriate for a particular NAAQS. For example, CAA section 107(d)(1)(B)(ii) explicitly provides that the EPA can make modifications to designation recommendations for an area "or portions thereof," and under CAA section 107(d)(1)(B)(iv) a designation remains in effect for an area "or portion thereof" until the EPA redesignates it.

Section 107(d)(1)(B) of the CAA requires the EPA to issue initial area designations within 2 years of promulgating a new or revised NAAQS. However, if the Administrator has insufficient information to make these designations within that time frame, the EPA has the authority to extend the deadline for designation decisions by up to 1 additional year.

By no later than 1 year after the promulgation of a new or revised NAAQS, CAA section 107(d)(1)(A) provides that each state governor shall recommend air quality designations, including the appropriate boundaries for areas, to the EPA. The EPA reviews those state recommendations and is authorized to make any modifications the Administrator deems necessary. The statute does not define the term "necessary," but the EPA interprets this to authorize the Administrator to modify designation recommendations that are inconsistent with the statutory language, including modification of recommended boundaries for nonattainment areas that are not supported by the facts or analysis. If the EPA intends to modify a state's recommendation, section 107(d)(1)(B) of the CAA requires the EPA to notify the state of any such intended modifications not less than 120 days prior to the EPA's promulgation of the final designation. These notifications are commonly known as the "120-day letters." During this period, if the state does not agree with the EPA's proposed modification, it has an opportunity to respond to the EPA and to demonstrate why it believes the modification proposed by the EPA is inappropriate. If a state fails to provide any recommendation for an area, in whole or in part, the EPA must promulgate a designation that the Administrator deems appropriate, pursuant to CAA section 107(d)(1)(B)(ii).

Section 301(d) of the CAA authorizes the EPA to approve eligible Indian tribes to implement provisions of the CAA on Indian reservations and other areas within the tribes' jurisdiction. The Tribal Authority Rule (TAR) (40 CFR part 49), which implements section 301(d) of the CAA, sets forth the criteria and process for tribes to apply to the EPA for eligibility to administer CAA programs. The designations process contained in section 107(d) of the CAA is included among those provisions determined to be appropriate by the EPA for treatment of tribes in the same manner as states. Under the TAR, tribes generally are not subject to the same submission schedules imposed by the CAA on states. As authorized by the TAR, tribes may seek eligibility to submit designation recommendations to the EPA.

## VI. What is the chronology for this designations action and what guidance did the EPA provide?

On February 25, 2016, the EPA issued guidance for states and tribal agencies to use for purposes of making designation recommendations as required by CAA section 107(d)(1)(A). (*See* February 25, 2016, memorandum from Janet G. McCabe, Acting Assistant Administrator, to Regional Administrators, Regions 1–10, titled, "Area Designations for the 2015 Ozone National Ambient Air Quality Standards" (Designations Guidance)). The Designations Guidance provided

---

[2] *See* 80 FR 65296; October 26, 2015, for a detailed explanation of the calculation of the 3-year, 8-hour average and 40 CFR part 50, Appendix U.

[3] This view was confirmed in *Catawba County* v. *EPA,* 571 F.3d 20 (D.C. Cir. 2009).

the anticipated timeline for designations and identified important factors that the EPA recommended states and tribes consider in making their recommendations and that the EPA intended to consider in promulgating designations. These factors include air quality data, emissions and emissions-related data, meteorological data, geography/topography, and jurisdictional boundaries. In the Designations Guidance, the EPA asked that states and tribes submit their designation recommendations, including appropriate area boundaries, to the EPA by October 1, 2016. The EPA had previously issued two guidance memoranda related to designating areas of Indian country that also apply for designations for the 2015 ozone NAAQS.

See December 20, 2011, memorandum from Stephen D. Page, Director, Office of Air Quality Planning and Standards, to Regional Air Directors, Regions I–X, titled, ''Policy for Establishing Separate Air Quality Designations for Areas of Indian Country,'' (Tribal Designations Guidance) and December 20, 2011, memorandum from Stephen D. Page, Director, Office of Air Quality Planning and Standards, to Regional Air Directors, Regions I–X, titled, ''Guidance to Regions for Working with Tribes during the National Ambient Air Quality Standards (NAAQS) Designations Process.'' In the Designation Guidance, the EPA indicated the Agency expected to complete the initial designations for the 2015 ozone NAAQS on a 2-year schedule, by October 1, 2017, consistent with CAA 107(d)(1)(B)(i).

On November 6, 2017, the EPA designated as attainment/unclassifiable 2,646 counties,[4] including tribal lands within those counties, for which the states recommended a designation of attainment or attainment/unclassifiable. This represents approximately 85 percent of the counties in the U.S. The EPA also designated a three-county area in Washington as unclassifiable as recommended by the state. Consistent with the EPA's Tribal Designation Guidance, the EPA designated two areas of Indian country (Fond du Lac Band of Lake Superior Chippewa Indians and Forest County Potawatomi Community) as separate attainment/unclassifiable areas.

On or about December 22, 2017, the EPA sent 120-day letters to Governors and tribal leaders notifying them of the EPA's preliminary response to their designation recommendations for all areas of the country not designated in the November 2017 action, with the exception of eight counties in the San Antonio, Texas metropolitan area. For the areas addressed in the 120-day letters, the EPA requested that states and tribes submit any additional information that they wanted the EPA to consider in making final designation decisions by February 28, 2018, including any certified 2017 air quality monitoring data.

Although not required by section 107(d)(2)(B) of the CAA, the EPA also provided a 30-day public comment period on the designation recommendations from states and tribes and the EPA's intended designations addressed in the 120-day letters to states and tribes. The EPA announced the public comment period in the **Federal Register** on January 5, 2018 (83 FR 651). On April 30, 2018, the EPA finalized designations for the areas addressed in the December 2017 120-day letter responses to states and tribes.

In response to the *Clean Wisconsin* court decision relating to that April 30, 2018, action, the EPA has again applied a uniform, nationwide analytical approach and interpretation of CAA section 107(d)(1) to these areas across the country and reviewed the state and tribal responses and public comments, as well as reviewed the court decision itself, in the Agency's decision to revise certain designations remanded by the court. Comments from the states, tribes and the public, and the EPA's updated responses to significant comments, are also available in the docket along with the individual TSDs for areas with associated remanded counties.

In the *Clean Wisconsin* decision, the D.C. Circuit directed the EPA to complete a process to revise, as appropriate, its April 2018 designations for the remanded counties ''as expeditiously as practicable.'' The CAA does not require the EPA to follow a specific process when final designations are remanded to the Agency. The EPA's final action reflects a reasonable interpretation of the CAA section 107(d) requirements, particularly given the court's direction.

Under CAA section 107(d)(2)(B), the EPA is not required to provide an Administrative Procedure Act (APA) public comment period for designations actions. CAA section 107(d)(1)(B)(ii) lays out a particular process when the EPA disagrees with a state's recommended designations. In particular, the Administrator must provide the state with 120 days to demonstrate why any proposed modifications to the state's recommendation are inappropriate. The EPA notified Texas and Colorado on or about May 24, 2021, that the Agency intended to modify the states' recommendations and provided intended designations revisions. Although not required by section 107(d)(2)(B) of the CAA, the EPA also provided a 30-day public comment period on the designation recommendations from Texas and Colorado and the EPA's intended designations revisions addressed in the 120-day letters.

**VII. What air quality data has the EPA used to designate the remanded areas for the 2015 ozone NAAQS?**

For the two remanded counties and associated nonattainment areas addressed in this action, as well the 14 remanded counties addressed in a previous action, the EPA has re-evaluated the designations under a uniform, nationwide analytical approach in considering the specific facts and circumstances of the areas using data and information available at the time of the April 30, 2018, final designations action. The EPA has primarily based the revised final ozone designations in this action on air quality monitoring data from the years 2014–2016, which were the most recent data that states were required to certify at the time the EPA notified states of its intended designations and any intended modifications to their recommendations in December 2017. Under 40 CFR 58.16, states are required to report all monitored ozone air quality data and associated quality assurance data within 90 days after the end of each quarterly reporting period, and under 40 CFR 58.15(a)(2), states are required to submit annual summary reports and a data certification letter to the EPA by May 1 for ozone air quality data collected in the previous calendar year. Thus, at the time of the 120-day letters, the most recent certification obligation was for air quality data from 2016. In the 120-day notification letters to states, the EPA indicated that for the EPA to consider air quality data for the period 2015–2017 in the final designation decisions for any area, a state must submit certified, quality assured 2015–2017 air quality monitoring data for the area to the EPA by February 28, 2018. Colorado, Texas, and New Mexico did not choose to submit early certified air quality

---
[4] Any reference to ''counties'' in this action also includes non-county administrative or statistical areas that are comparable to counties. Louisiana parishes; the organized boroughs of Alaska; the District of Columbia; and the independent cities of the states of Virginia, Maryland, Missouri, and Nevada are equivalent to counties for administrative purposes. Alaska's Unorganized Borough is divided into 10 census areas that are statistically equivalent to counties. As of 2017, there are currently 3,142 counties and county-equivalents in the United States.

monitoring data. Therefore, the April 30, 2018 initial designations for these states were based on air quality data from 2014–2016.

The EPA's reliance on only information available at the time of the April 30, 2018, designations action to support the revised designations in this **Federal Register** document is reasonable in light of the circumstances. The CAA does not specify what data the Agency must rely on in re-promulgating designations upon remand from a court. As such, the EPA's reasonable reliance on data available on April 30, 2018, reflects the EPA's dedication to national consistency and the specific direction of the court in *Clean Wisconsin:* "to issue revised designations as expeditiously as practicable" in responding to the remand.[5]

Section 107(d) of the CAA lays out a particular timeline for designations decisions to be made, triggered from the promulgation date of a NAAQS. For the 2015 ozone NAAQS, the designation of every area of the country, apart from those remanded to the Agency, relied on the existing record.[6] As the D.C. Circuit stated in previous cases reviewing the EPA's designations decisions, "inconsistency is the hallmark of arbitrary agency action."[7] Relying on the data available to the Agency at the time of the April 2018 designations action would prevent inconsistent treatment between the remanded counties and every other area of the country.

In addition, both our previous action responding to the Court remand for 14 counties and this action expand the boundaries of existing nonattainment areas but do not create any new nonattainment areas. If it is important to treat areas across the country consistently, it is that much more important that the EPA treat *different portions of the same nonattainment area* consistently. The EPA received some comments on this approach; further explanation for the EPA's decision to rely on the data available on April 30, 2018, appears in the EPA's Response to Comments document, available in the electronic docket for this action (*www.regulations.gov,* docket number EPA–HQ–OAR–2017–0548) and at the EPA's Ozone Designations web page (*https://www.epa.gov/ozone-designations*).

The D.C. Circuit's direction to act "as expeditiously as practicable" also weighs in favor of using information available on April 30, 2018. Gathering and analyzing new data would necessarily have taken longer, because much of the data the EPA generally relies upon in its designations decision-making process is obtained outside the Agency, including from states.

## VIII. What are the ozone air quality classifications and implementation dates?

In accordance with CAA section 181(a)(1), each area designated as nonattainment for the ozone NAAQS is classified by operation of law when designated by the EPA. Under Subpart 2 of part D of title I of the CAA, state planning and emissions control requirements for ozone are determined, in part, by a nonattainment area's classification. The ozone nonattainment areas are classified based on the severity of their ozone levels (as determined based on the area's "design value," which represents air quality in the area for the most recent 3 years).[8] The possible classifications are Marginal, Moderate, Serious, Severe, and Extreme. Nonattainment areas with a "lower" classification have ozone levels that are closer to the standard than areas with a "higher" classification. Areas in the lower classification levels have fewer and/or less stringent mandatory air quality planning and control requirements than those in higher classifications. On March 9, 2018 (83 FR 10376), the EPA published the Classifications Rule that establishes how the statutory classifications will apply for the 2015 ozone NAAQS, including the air quality thresholds for each classification category. Each nonattainment area's design value, based on the then-most recent 3 years of certified air quality monitoring data, is used to establish the classification for the area.

The regulatory tables included at the end of this action for the Denver Metro/North Front Range, CO nonattainment area and the El Paso-Las Cruces, TX–NM nonattainment area provide the classification for the designated nonattainment area for the 2015 ozone NAAQS based on the design value for the area and the classification thresholds established in the Classification Rule. Both of these areas addressed in this **Federal Register** document are Marginal nonattainment areas.

As established in the final implementing regulations for the 2015 ozone NAAQS, nonattainment areas (including the areas subject to this final action) shall attain the 2015 standards as expeditiously as practicable but not later than the dates provided in Table 1 of 40 CFR 51.1303(a) expressed in years after the effective date of area designations, which was August 3, 2018 (83 FR 25776; June 4, 2018). The resulting attainment date for Marginal areas is not later than 3 years from the designation effective date, or August 3, 2021. Further, states with Marginal nonattainment areas have 2 years from the effective date of designation to submit state implementation plan (SIP) revisions addressing emissions inventories (required by CAA section 182(a)(1)) and emissions statement regulations (CAA section 182(a)(3)(B)) (83 FR 62998, 63000; December 6, 2018). *See* also 40 CFR 51.1315. The resulting emissions inventory and emissions statement SIP revisions were due August 3, 2020. The August 3, 2021, Marginal area attainment date still applies for the areas subject to this final action, inclusive of the revised nonattainment boundaries. As with the other 14 remanded counties, the August 3, 2020, SIP submission requirements apply to the entirety of Weld County, Colorado. The EPA expects states with areas subject to this final action to work with their respective EPA Regional office to submit any necessary supplements or revisions to fulfill the Marginal area SIP revision requirements associated with the nonattainment boundaries in this final action as expeditiously as practicable.

However, the EPA recognizes that Texas is in a unique position among the states affected by the D.C. Circuit's remand. For all of the other nonattainment area boundaries modified either in this document or in the previous action (86 FR 31438; June 14, 2021) in response to the court's decision, the relevant states already had counties or portions of counties as a part of those nonattainment areas, and thus already had an August 3, 2020, deadline to submit SIPs meeting the requirements for a Marginal nonattainment area. However, no portion of Texas was already designated nonattainment as a part of the Doña Ana, New Mexico area; as such, Texas had no notice that it should prepare a Marginal area SIP submission for that area. Given the lack of prior notice, the EPA believes it is reasonable to provide Texas with a deadline of December 30, 2022 to

---

[5] *Clean Wisconsin,* 964 F.2d at 1176.

[6] As is discussed earlier in this section, almost every designation relied on monitored 2014–2016 design values. The few exceptions were for states that early-certified 2015–2017 data in accordance with the Designation Guidance.

[7] *Catawba County* v. *EPA,* 571 F.3d 20, 51 (D.C. Cir. 2009); *see also Mississippi Comm'n* v. *EPA,* 790 F.3d 138, 160 (D.C. Cir. 2015).

[8] The air quality design value for the 8-hour ozone NAAQS is the 3-year average of the annual 4th highest daily maximum 8-hour average ozone concentration. *See* 40 CFR part 50, Appendix U.

submit a SIP submission that meets all the Marginal nonattainment area planning requirements for the newly expanded El Paso-Las Cruces Texas-New Mexico nonattainment area. *See* CAA section 301(a)(1).

Setting a separate deadline for El Paso's SIP submission is not at odds with the EPA's decision to keep a consistent attainment date for the entirety of the El Paso-Las Cruces Texas-New Mexico nonattainment area, or CAA section 182(j). The CAA requires that states take "reasonable" steps to coordinate planning efforts for joint nonattainment areas. Providing additional time to allow Texas to make a Marginal area submission will not interfere, and could better serve, future coordination on planning efforts for the entire nonattainment area. Other parts of the CAA also provide support for this final action's decisions regarding attainment dates and SIP submission deadlines. Section 182(i) of the CAA allows the Administrator to adjust SIP deadlines but not attainment dates upon mandatory reclassification of certain ozone nonattainment areas. In addition, areas subject to Marginal area requirements are not required to "plan" for attainment in the same way as areas classified Moderate and above. The primary substantive obligations associated with a Marginal classification are the requirement to submit an emissions inventory and the requirement that new sources in the area must implement nonattainment new source review. Neither requirement is integrally related to attainment planning—they are not submitted to demonstrate how the area will attain or make reasonable further progress towards attainment, and they are not suspended if the area is attaining.

Setting a reasonable future deadline for SIP submissions is consistent with the EPA's past practice and D.C. Circuit precedent. On January 4, 2013, the D.C. Circuit remanded the EPA's 2007 PM$_{2.5}$ Implementation Rule,[9] finding that the EPA had applied the incorrect set of implementation provisions within the CAA, including a series of deadlines for SIP submissions.[10] Upon remand, the deadlines that should have applied to the relevant areas were in the past. Given that, the EPA took final action in 2014 to set up "relatively brief but reasonable" deadlines for required SIP submissions. While the action changed the submission deadlines, it also left in place the attainment dates that had occurred in the past for the relevant nonattainment areas. Petitioners challenged the EPA's rule establishing future SIP submittal deadlines on the basis that the CAA established SIP submittal deadlines, those should have applied based on the D.C. Circuit's earlier decision, and the EPA lacked discretion to change those deadlines. The EPA's rule establishing new, future SIP submittal deadlines in this circumstance was upheld by the D.C. Circuit in *WildEarth Guardians* v. *EPA,* 830 F.3d 529 (D.C. Cir. 2016) (finding that the EPA acted within its authority in novel circumstances where a SIP submission deadline passed without states' awareness due to a remanded action).

The EPA recognizes that the Agency did not specifically provide notice in its June 14, 2021 intended designations that Texas's Marginal area SIP submission deadlines would be extended from August 3, 2020 to December 30, 2022. However, as discussed in the previous section, under CAA section 107(d)(2)(B), designations actions are specifically exempted from the notice and comment requirements of the APA. *See* CAA section 172(b) (requiring the Administrator to establish a schedule for SIP requirements at the time the Administrator promulgates a nonattainment designation). In addition, the Agency did not specify what deadline would apply, and numerous commenters addressed the issue in comments, suggesting that the Agency in fact provided enough notice on the issue that it is appropriate to finalize without additional notice. As such, the EPA does not believe that a more specific notice was necessary to extend Texas's SIP submission deadlines.

Even if additional notice were required, the EPA would have good cause to waive such a requirement to finalize an extension of Texas's SIP submission deadlines for the revised additional portion of the El Paso-Las Cruces TX–NM nonattainment area, as providing an additional notice and comment period would be impracticable and contrary to the public interest. *See* APA Section 553(b)(B). Upon the effective date of this final action, without a finalized extension of Texas's SIP deadline, the EPA would immediately be vulnerable to deadline litigation for the Agency's failure to issue findings of failure to submit under CAA section 107(k)(1)(B)—for a state that until today was not required to submit anything to the Agency. And, the Agency does not have time, given the deadlines for other statutorily-required actions and the *Clean Wisconsin* court's direction for the EPA to act as expeditiously as practicable, to wait to finalize these revised designations for a full notice-and-comment process on this lone issue, which is a small part of a large and complex series of Agency actions. Further, a specific, brief, and reasonable deadline set in the future provides the state and stakeholders with certainty and the ability to develop and submit the SIP revisions at issue on a timely basis, rather than complications and potential mandatory duty deadline suit litigation that could ensue if the EPA established a submittal deadline that had already lapsed.

## IX. Environmental Justice (EJ) Considerations

Consideration of EJ concerns is consistent with an Administrator directive and presidential executive orders. On April 7, 2021, the Administrator directed the EPA offices to take immediate and affirmative steps to incorporate EJ considerations into the regulatory development processes.[11] The EPA has defined environmental justice as "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation and enforcement of environmental laws, regulations and policies."[12] The Administrator's directive came as part of implementing the Biden-Harris Administration's executive order (E.O. 13985, 86 FR 7009, January 25, 2021) directing all federal agencies to embed equity into their programs and services to ensure the consistent and systematic fair, just, and impartial treatment of all individuals, including those who belong to underserved communities that have been denied such treatment.[13] E.O. 13985 defines the term "underserved communities" as referring to populations sharing a particular characteristic, as well as geographic communities, that have been systematically denied a full opportunity to participate in aspects of economic,

---

[9] Final Clean Air Fine Particle Implementation Rule, 72 FR 20585 (April 25, 2007).

[10] Identification of Nonattainment Classification and Deadlines for Submission of State Implementation Plan (SIP) Provisions for the 1997 Fine Particle (PM$_{2.5}$) National Ambient Air Quality Standard (NAAQS) and 2006 p.m.2.5 NAAQS, 79 FR 31,566 (June 2, 2014).

[11] Message from the EPA Administrator, Our Commitment to Environmental Justice (issued April 7, 2021) at *https://www.epa.gov/sites/production/files/2021-04/documents/regan-messageon commitmenttoenvironmentaljustice-april072021.pdf.*

[12] *See https://www.epa.gov/environmentaljustice/learn-about-environmental-justice.*

[13] "Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government" (E.O. 13985, issued January 20, 2021) at *https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/.*

social, and civic life. The new E.O. 13985 is an update to E.O. 12898 ("Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations," 59 FR 7629, February 16, 1994) that directed federal agencies to focus on the environmental and human health effects of federal actions on minority and low-income populations with the goal of achieving environmental protection for all communities.[14] Finally, in a subsequent executive order addressing the global climate crisis (E.O. 14008), the Biden-Harris Administration formalized their commitment to make EJ a part of the mission of every agency by directing federal agencies to develop programs, policies, and activities to address the disproportionate health, environmental, economic, and climate impacts on disadvantaged communities.[15]

When the EPA establishes a new or revised NAAQS, the CAA requires the EPA to designate all areas of the U.S. as either nonattainment, attainment, or unclassifiable. This action for El Paso County, Texas and Weld County, Colorado, revises certain designation determinations for the 2015 ozone NAAQS that were identified in the July 10, 2020, court remand. Since these two areas have air quality that do not meet the NAAQS, or have been determined to contribute emissions to such areas, the CAA requires relevant state authorities to initiate appropriate air quality management actions to ensure that all those residing, working, attending school, or otherwise present in those areas are protected, regardless of minority and economic status.

As part of this area designation action, the EPA evaluated a number of EJ issues, including the demographics of the impacted area, higher susceptibility in response to pollution exposure, and capacity to participate in decision making, as described in this section. Specifically, the EPA analyzed certain key demographics for both El Paso County, Texas, and Weld County Colorado, as part of the EJ evaluation conducted for this rulemaking effort. Additionally, the EPA provided the public with information about the air quality in the relevant areas of the country and provided adequate opportunity for public comment on the EPA's proposal.

*Demographics of impacted area.* The EPA evaluated the 2019 census data available for El Paso County, Texas and Weld County, Colorado to identify key demographic indicators. These include the percent of the population identifying as people of color [16] as well as the percent of the population identifying as low income.[17] In El Paso County, Texas,[18] 91.1 percent of the population identify as people of color (mostly as Hispanic or Latino) and 18.8 percent identify as low income. By comparison, 39.7 percent of the population of the state of Texas and 18.5 percent of the nation identify as Hispanic or Latino. In Weld County, Colorado,[19] 37.6 percent of the population identify as people of color and 8.4 percent of the population identify as low income.[20]

*Higher susceptibility in response to pollution exposure.* As discussed in the EPA's EJ Technical Guidance, people of color, low-income populations, and indigenous peoples often experience greater exposure and disease burdens than the general population as a whole, which can increase their susceptibility to adverse health effects from environmental stressors.[21] We recognize also that underserved communities can experience reduced access to health care, nutritional, and fitness resources, further increasing their susceptibility. People susceptible to the effects of degraded ambient air include people with asthma, children, older adults, and people who are active outdoors, especially outdoor workers. The resulting adverse respiratory effects can include, *e.g.,* difficulty in breathing, airway inflammation and damage, aggravation of lung diseases, and increased frequency of asthma attacks.[22] Exposure to elevated concentrations of nitrogen dioxide (a type of $NO_X$ compound and ozone precursor) can produce similar adverse health effects to ozone.[23] VOC emissions can include listed Hazardous Air Pollutants (HAPs) that cause or may cause serious health problems such as cancer, and noncancer effects on the lungs and other parts of the respiratory system; on the immune, nervous and reproductive systems; and to organs such as the heart, liver and kidneys.[24]

*Capacity to participate in decision making.* The inability to participate in the environmental decision-making process may contribute to disproportionate adverse impacts for underserved communities. Obstacles to participation may include lack of trust; availability or lack of information; language barriers and other socio-cultural issues; inability to access available communication channels; and limited capacity to access technical and legal resources.

On June 14, 2021, the EPA published a Notice of Availability in the **Federal Register**, providing EPA's intended designations for the remanded El Paso and Weld Counties and provided a 30-day public comment period. The EPA received comments from a wide range of stakeholders to include small business, industry, environmental groups, governmental planning agencies, county commissioners and the public at large from both areas. All comments received and responses are in the docket for this action.

## X. Statutory and Executive Order Reviews

*A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review*

This action is exempt from review by the Office of Management and Budget because it responds to the CAA

---

[14] See https://www.epa.gov/sites/production/files/2015-02/documents/exec_order_12898.pdf.

[15] "Executive Order on Tackling the Climate Crisis at Home and Abroad" (E.O. 14008, issued January 27, 2021) at https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/.

[16] By percent identifying as people of color we mean the percent of individuals in a block group who list their racial status as a race other than white alone and/or list their ethnicity as Hispanic or Latino. That is, all people other than non-Hispanic white-alone individuals. The word "alone" in this case indicates that the person is of a single race, not multiracial. Source: The Census Bureau's American Community Survey 5-year summary estimates.

[17] Following the Office of Management and Budget's (OMB) Statistical Policy Directive 14, the Census Bureau uses a set of money income thresholds that vary by family size and composition to determine who is in poverty. If a family's total income is less than the family's threshold, then that family and every individual in it is considered in poverty. The official poverty thresholds do not vary geographically, but they are updated for inflation using Consumer Price Index (CPI–U). The official poverty definition uses money income before taxes and does not include capital gains or noncash benefits (such as public housing, Medicaid, and food stamps). Source: How the Census Bureau Measures Poverty.

[18] The Census Bureau population estimate on July 1, 2019, for El Paso County, Texas from which this data derives was 839,238.

[19] The Census Bureau population estimate on July 1, 2019, for Weld County, Colorado from which this data derives was 324,492.

[20] The percent of individuals in a block group who list their racial status as a race other than white alone and/or list their ethnicity as Hispanic or Latino. That is, all people other than non-Hispanic white-alone individuals. The word "alone" in this case indicates that the person is of a single race, not multiracial. Source: The Census Bureau's American Community Survey 5-year summary estimates.

[21] "Technical Guidance for Assessing Environmental Justice in Regulatory Analysis," Section 4 (June 2016) at https://www.epa.gov/sites/production/files/2016-06/documents/ejtg_5_6_16_v5.1.pdf.

[22] See https://www.epa.gov/ground-level-ozone-pollution/health-effects-ozone-pollution.

[23] See https://www.epa.gov/no2-pollution/basic-information-about-no2.

[24] See https://www.epa.gov/national-air-toxics-assessment/nata-frequent-questions#background1.

requirement to promulgate air quality designations after promulgation of a new or revised NAAQS.

*B. Paperwork Reduction Act (PRA)*

This action does not impose an information collection burden under the PRA. This action fulfills the non-discretionary duty for the EPA to promulgate air quality designations after promulgation of a new or revised NAAQS and does not contain any information collection activities.

*C. Regulatory Flexibility Act (RFA)*

This action is not subject to the RFA. The RFA applies only to rules subject to notice and comment rulemaking requirements under the Administrative Procedure Act (APA), 5 U.S.C. 553, or any other statute.

*D. Unfunded Mandates Reform Act (UMRA)*

This action does not contain any unfunded mandate as described in UMRA, 2 U.S.C. 1531–1538 and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector.

*E. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government. The division of responsibility between the federal government and the states for purposes of implementing the NAAQS is established under the CAA.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action has tribal implications. However, it will neither impose substantial direct compliance costs on federally recognized tribal governments, nor preempt tribal law. There was one Federally Recognized Tribe that was potentially affected by this action, the Ysleta del Sur Pueblo. Consistent with the EPA Policy on Coordination and Consultation with Indian Tribes, by letter dated May 26, 2021, the EPA offered the Ysleta del Sur Pueblo the opportunity for consultation and informed the tribe of the designations process and the intended designation for El Paso County, TX. The tribe did not request any consultation.

*G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks*

The EPA interprets Executive Order 13045 as applying to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of ''covered regulatory action'' in section 2–202 of the Executive Order. This action is not subject to Executive Order 13045 because it does not establish an environmental standard intended to mitigate health or safety risks.

*H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution or Use*

This action is not subject to Executive Order 13211 because it is not a significant regulatory action under Executive Order 12866.

*I. National Technology Transfer and Advancement Act (NTTAA)*

This rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

The EPA believes that this action does not have disproportionately high and adverse human health or environmental effects on minority populations, low-income populations and/or indigenous peoples, as specified in Executive Order 12898 (59 FR 7629, February 16, 1994). The documentation for this determination is contained in Section IX of this preamble, ''Environmental Justice Concerns.''

*K. Congressional Review Act (CRA)*

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the U.S. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

*L. Judicial Review*

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the Court of Appeals for the District of Columbia Circuit: (i) When the Agency action consists of ''nationally applicable regulations promulgated, or final action taken, by the Administrator,'' or (ii) when such action is locally or regionally applicable, ''if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination.'' For locally or regionally applicable final actions, the CAA reserves the EPA complete discretion whether to invoke the exception in (ii).

This final action designating areas for the 2015 ozone NAAQS is ''nationally applicable'' within the meaning of CAA section 307(b)(1). In the alternative, to the extent a court finds this action to be locally or regionally applicable, the Administrator is exercising the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on a determination of ''nationwide scope or effect'' within the meaning of CAA section 307(b)(1).[25] This final action establishes designations for two areas across the U.S. for the 2015 ozone NAAQS, located in two states, in two EPA regions, and in two different federal judicial circuits.[26] This final action applies a uniform, nationwide analytical method and interpretation of CAA section 107(d)(1) to these areas across the country in a single final action, and the final action is based on this common core of determinations. More specifically, this final action is based on a determination by the EPA to evaluate areas nationwide under a common five factor analysis in determining whether areas were in violation of or contributing to an area in violation of the 2015 ozone NAAQS at the time of the April 2018 designations final action. For example, the EPA's revised designations are based on a determination by the EPA to reconsider the information and data in the record and available at the time of the designations action signed April 2018, rather than considering newer air quality information.

For these reasons, this final action is nationally applicable or, alternatively, the Administrator is exercising the complete discretion afforded to him by the CAA and hereby finds that this final action is based on a determination of nationwide scope or effect for purposes of CAA section 307(b)(1) and is hereby publishing that finding in the **Federal**

---

[25] In deciding whether to invoke the exception by making and publishing a finding that this final action is based on a determination of nationwide scope or effect, the Administrator has also taken into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of Agency resources.

[26] In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the ''nationwide scope or effect'' exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. *See* H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

Register. Under section 307(b)(1) of the CAA, any petitions for review of this final action must be filed in the U.S. Court of Appeals for the District of Columbia Circuit within 60 days from the date this final action is published in the **Federal Register**. Filing a petition for reconsideration by the Administrator of these final actions does not affect the finality of the actions for the purposes of judicial review, nor does it extend the time within which a petition for judicial review must be filed and shall not postpone the effectiveness of such actions.

### List of Subjects in 40 CFR Part 81

Environmental protection, Air pollution control, National parks, Wilderness areas.

**Michael S. Regan,**
*Administrator.*

For the reasons set forth in the preamble, the EPA amends 40 CFR part 81 as follows:

## PART 81—DESIGNATIONS OF AREAS FOR AIR QUALITY PLANNING PURPOSES

■ 1. The authority citation for part 81 continues to read as follows:

**Authority:** 42 U.S.C. 7401, *et. seq.*

### Subpart C—Section 107 Attainment Status Designations

■ 2. In § 81.306, the table titled "Colorado—2015 8-Hour Ozone NAAQS [Primary and Secondary]" is amended by:
■ a. Under the heading "Denver Metro/North Front Range, CO" removing the entry for "Weld County (part)" and adding in its place an entry for "Weld County";
■ b. Removing the entry "Weld County (part) remainder" after the entry for "Washington County".

The addition reads as follows:

### § 81.306  Colorado.

\*  \*  \*  \*  \*

COLORADO—2015 8-HOUR OZONE NAAQS
[Primary and secondary]

| Designated area [1] | Designation | | Classification | |
|---|---|---|---|---|
| | Date [2] | Type | Date [2] | Type |
| Denver Metro/North Front Range, CO | | Nonattainment | | Marginal. |
| \*    \*    \*    \*    \* | | | | |
| Weld County | December 30, 2021 [3]. | | | |
| \*    \*    \*    \*    \* | | | | |

[1] Includes any Indian country in each county or area, unless otherwise specified. EPA is not determining the boundaries of any area of Indian country in this table, including any area of Indian country located in the larger designation area. The inclusion of any Indian country in the designation area is not a determination that the state has regulatory authority under the Clean Air Act for such Indian country.
[2] This date is August 3, 2018, unless otherwise noted.
[3] EPA revised the nonattainment boundary in response to a court decision, which did not vacate any designations for the 2015 ozone NAAQS, but which remanded the designation for the identified county. Because this additional area is part of a previously designated nonattainment area, the associated implementation dates for the overall nonattainment area (*e.g.,* the August 3, 2021 attainment date) remain unchanged regardless of this later designation date.

\*  \*  \*  \*  \*

■ 3. In § 81.332, the table titled "New Mexico—2015 8-Hour Ozone NAAQS [Primary and Secondary]" is amended by removing the entry "Doña Ana County (Sunland Park Area), NM" and adding the entry "El Paso-Las Cruces, TX–NM" in its place to read as follows:

### § 81.332  New Mexico.

\*  \*  \*  \*  \*

NEW MEXICO—2015 8-HOUR OZONE NAAQS
[Primary and secondary]

| Designated area [1] | Designation | | Classification | |
|---|---|---|---|---|
| | Date [2] | Type | Date [2] | Type |
| El Paso-Las Cruces, TX–NM | | Nonattainment | | Marginal. |
| \*    \*    \*    \*    \* | | | | |

[1] Includes any Indian country in each county or area, unless otherwise specified. EPA is not determining the boundaries of any area of Indian country in this table, including any area of Indian country located in the larger designation area. The inclusion of any Indian country in the designation area is not a determination that the state has regulatory authority under the Clean Air Act for such Indian country.
[2] This date is August 3, 2018, unless otherwise noted.

\*  \*  \*  \*  \*

■ 4. In § 81.344, the table titled "Texas—2015 8-Hour Ozone NAAQS [Primary and Secondary]" is amended as follows:

■ a. Adding the entry "El Paso-Las Cruces, TX–NM" above the entry "Houston-Galveston-Brazoria, TX";
■ b. Adding the entry "El Paso County" under the new entry "El Paso-Las Cruces, TX–NM";
■ c. Under the entry "Rest of State" removing the entry "El Paso County".

The revisions and addition read as follows:

### § 81.344  Texas.

\*  \*  \*  \*  \*

TEXAS—2015 8-HOUR OZONE NAAQS
[Primary and secondary]

| Designated area[1] | Designation | | Classification | |
|---|---|---|---|---|
| | Date[2] | Type | Date[2] | Type |
| * * * * * * * | | | | |
| El Paso-Las Cruces, TX–NM | | | | |
| El Paso County | December 30, 2021[3] | Nonattainment | | Marginal. |
| * * * * * * * | | | | |

[1] Includes any Indian country in each county or area, unless otherwise specified. EPA is not determining the boundaries of any area of Indian country in this table, including any area of Indian country located in the larger designation area. The inclusion of any Indian country in the designation area is not a determination that the state has regulatory authority under the Clean Air Act for such Indian country.
[2] This date is August 3, 2018, unless otherwise noted.
[3] EPA revised the nonattainment boundary in response to a court decision, which did not vacate any designations for the 2015 ozone NAAQS, but which remanded the designation for the identified county. Because this additional area is part of a previously designated nonattainment area, the associated August 3, 2021 attainment date remains unchanged regardless of this later designation date. EPA established a later state implementation plan submission date for El Paso County.

* * * * *

[FR Doc. 2021–25451 Filed 11–29–21; 8:45 am]
BILLING CODE 6560–50–P

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Medicare & Medicaid Services**

**42 CFR Part 413**

[CMS–1752–CN2 and CMS–1762–CN2]

RINs 0938–AU44 and 0938–AU56

**Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System and Policy Changes and Fiscal Year 2022 Rates; Quality Programs and Medicare Promoting Interoperability Program Requirements for Eligible Hospitals and Critical Access Hospitals; Changes to Medicaid Provider Enrollment; and Changes to the Medicare Shared Savings Program; Correction**

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS).
**ACTION:** Final rule; correction.

**SUMMARY:** This document corrects typographical errors in the final rule that appeared in the August 13, 2021, **Federal Register** as well as additional typographical errors in a related correcting amendment that appeared in the October 20, 2021, **Federal Register**. The final rule was titled ''Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long Term Care Hospital Prospective Payment System and Policy Changes and Fiscal Year 2022 Rates; Quality Programs and Medicare Promoting Interoperability Program Requirements for Eligible Hospitals and Critical Access Hospitals; Changes to Medicaid Provider Enrollment; and Changes to the Medicare Shared Savings Program''.
**DATES:**
*Effective date:* This correcting document is effective on November 29, 2021.
*Applicability date:* This correcting document is applicable for discharges beginning October 1, 2021.
**FOR FURTHER INFORMATION CONTACT:**
Allison Pompey, (410) 786–2348, New Technology Add-On Payment Issues.
**SUPPLEMENTARY INFORMATION:**

**I. Background**

In the final rule which appeared in the August 13, 2021, **Federal Register** (86 FR 44774) entitled ''Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long Term Care Hospital Prospective Payment System and Policy Changes and Fiscal Year 2022 Rates; Quality Programs and Medicare Promoting Interoperability Program Requirements for Eligible Hospitals and Critical Access Hospitals; Changes to Medicaid Provider Enrollment; and Changes to the Medicare Shared Savings Program'' (hereinafter referred to as the FY 2022 IPPS/LTCH PPS final rule), there were a number of technical and typographical errors. To correct the typographical and technical errors in the FY 2022 IPPS/LTCH PPS final rule, we published a correcting document that appeared in the October 20, 2021, **Federal Register** (86 FR 58019) (hereinafter referred to as the FY 2022 IPPS/LTCH PPS correcting amendment).

In FR Doc. 2021–22724 of October 20, 2021 (86 FR 58019), there was an inadvertent omission and typographical error that are identified and corrected in this correcting document. This document also corrects additional typographical errors in FR Doc. 2021–16519 of August 13, 2021 (86 FR 44774). The corrections in this correcting document are applicable to discharges occurring on or after October 1, 2021, as if they had been included in the document that appeared in the August 13, 2021, **Federal Register**.

**II. Summary of Errors**

*A. Summary of Errors in the FY 2022 IPPS/LTCH PPS Final Rule*

On page 44974, in the table displaying the continuation of technologies approved for FY 2021 new technology add-on payments and still considered new for FY 2022, we are correcting inadvertent typographical errors in the coding used to identify cases involving the use of the BAROSTIM NEO™ System that are eligible for new technology add-on payments.

*B. Summary of Errors in the FY 2022 IPPS/LTCH PPS Correcting Document*

On page 58023 in section IV.A. of the FY 2022 IPPS/LTCH PPS correcting amendment, we inadvertently omitted corrections to pages 45133, 45150, and 45157 of the FY 2022 IPPS/LTCH PPS final rule, as summarized on page 58019 in section II.A. of the FY 2022 IPPS/LTCH PPS correcting amendment. We are also correcting an inadvertent typographical error in the coding used to identify cases involving the use of RECARBRIO™ that are eligible for new technology add-on payments.

**III. Waiver of Proposed Rulemaking and Delay in Effective Date**

Under 5 U.S.C. 553(b) of the Administrative Procedure Act (APA), the agency is required to publish a notice of the proposed rulemaking in the **Federal Register** before the provisions of a rule take effect. Similarly, section 1871(b)(1) of the Act requires the Secretary to provide for notice of the proposed rulemaking in the **Federal Register** and provide a